# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Robert W. Gettleman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 7411 | **DATE** | Mar. 19, 2002 |
| **CASE TITLE** | EPS Solutions etal v Deloitte & Touche, LLP, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

order ruling on motions to dismiss

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing 4/18/02, at 9:00 a.m.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Memorandum opinion and order entered. Accordingly, defendants' motions to dismiss are granted as to counts III, VI and X, and denied as to counts I, II, IV, V, VII, VIII and IX. Defendants' answers to the remaining counts are due by 4/15/02.
(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | |
| | No notices required. | | | |
| X | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | MAR 20 2002 date docketed | | 38 |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| GDS | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EPS SOLUTIONS CORPORATION and ENTERPRISE PROFIT SOLUTIONS CORPORATION, <br><br> Plaintiffs, <br><br> v. <br><br> DELOITTE & TOUCHE, LLP and JEFFERIES & COMPANY, INC., <br><br> Defendants. | No. 00 C 7411 <br><br> Judge Robert W. Gettleman |

## MEMORANDUM OPINION AND ORDER

Plaintiffs EPS Solutions Corporation and Enterprise Profit Solutions Corporation (together, "EPS") have brought a ten count amended complaint against defendants Deloitte & Touche, LLP ("D&T") and Jefferies & Company, Inc. ("Jefferies") alleging a complex scheme conducted by defendants and others acting in concert with them, to form EPS, a company comprised of entities that are or were engaged in business service fields. The complaint alleges that through the use of certain solicitation materials and information, and in the course of acquisitions undertaken in the "roll-up" of various entities into EPS, defendants misrepresented, concealed and failed to disclose material facts, and breached fiduciary duties owed to EPS. Counts I and II allege breach of fiduciary duty against D&T and Jefferies respectively. Count III alleges aiding and abetting of breach of fiduciary duty against both D&T and Jefferies. Counts IV, V and VI are brought against both D&T and Jefferies, alleging constructive fraud, fraud and civil conspiracy. Count VII is a professional malpractice claim against Jefferies. Counts VIII

and IX allege securities fraud and controlling personal liability against both D&T and Jefferies, and Count X is brought against Jefferies for violation of the Investment Advisors Act, 15 U.S.C. § 80b-1 et. seq. Both D&T and Jefferies have moved to dismiss all claims. For the reasons set forth below, the motions are granted in part and denied in part.

## Facts[1]

In 1995 D&T formed a division called Integrated Cost Reduction Strategies Group ("ICRS") to provide cost recovery business services to its audit clients. Christopher Massey, a D&T partner, was made managing partner of ICRS, and reported to an advisory board consisting of the managing partner of D&T as well as the "function heads" and other top D&T partners.

Because regulations of the Securities and Exchange Commission and American Institute of Certified Public Accountant prohibited D&T from receiving performance-based or "contingency" fees, D&T contracted with an intermediary firm, National Benefits Consultants, LLC ("NBC"), which then contracted with separate companies called "Alliance Members" to perform a majority of the services at ICRS's direction. NBC received a portion of the contingency fees for the services provided by the Alliance Members, and then paid most of those fees to ICRS. NBC, founded in 1995, was a shell corporation nominally owned by Eric Watts, although Massey owned an undisclosed option to purchase an one-half ownership.

ICRS was unprofitable. During the period of operation between 1996 and 1998 ICRS lost nearly $8 million. These losses, along with the regulatory concerns prompted by accepting

---

[1] The facts are taken from EPS's first amended complaint and, for purposes of the pending motion brought pursuant to Fed. R. Civ. P. 12(b)(6), are assumed to be true. A more complete description of the alleged fraud scheme can be found in the court's opinion in a related case, Hoffman v. Deloitte & Touche, 143 F. Supp.2d 995 (N.D. Ill. 2001).

2

performance-based fees or contingency fees, led D&T to devise an "exit strategy" pursuant to which D&T would sell off the ICRS division. The strategy evolved into a plan to promote, create and operate EPS.

Having decided to sell ICRS, D&T, through its partner Massey, enlisted the aid of defendant Jefferies, through its principal and officer Jeffery Weinhuff, to develop and carry out the plan to create, promote and operate EPS. Jefferies and D&T allegedly were founders of EPS.

According to the complaint, in the process of forming and operating EPS, D&T and Jefferies, in breach of their fiduciary duties, embarked on a scheme to defraud EPS so that they could each reap a financial windfall to the detriment of EPS. In carrying out this scheme, D&T and Jefferies positioned EPS to fail by "saddling it with underperforming businesses purchased by EPS for amounts far in excess of their value and subjecting EPS to extraordinary debt."

The plan, conceived by Massey, called for D&T to engineer a "roll-up," combining numerous third party cost recovery and consulting companies into the new enterprise (EPS), which would be used as a vehicle to borrow money from the Bank of America and other lenders. The money would then be used to purchase ICRS from D&T at an inflated price, and to purchase various cost recovery and consulting companies.

D&T provided virtually all of EPS's capital and funded its promotional, payroll and operating expenses both before and after EPS was created up until the date of the initial roll-up, December 14, 1998. D&T employees, including Massey, made up EPS's staff but also remained employees of D&T until the date of the roll-up, at which time they became full-time EPS employees.

D&T promoted and controlled EPS through Massey and other members of the Advisory Board. Massey reported directly to D&T senior partners regarding the method, procedure and details of the roll-up. While still employed by and working for D&T, Massey signed an employment agreement effective August 28, 1998, indicating that his role was also "CEO" of EPS Solutions Corp.

Jefferies, through Weinhuff and others, acted as financial and investment advisor for EPS pursuant to the terms of a letter agreement dated October 2, 1998 (the "engagement letter"). The engagement letter was entered between Jefferies on one hand, and NBC, Massey and Watts on the other all expressly for the benefit of EPS for the purpose affecting the roll-up. Both before and during the time period covered by the engagement letter, Jefferies, alleged to be a founder of EPS, acted, through its employees, as promoter of the roll-up. Weinhuff in particular took an active roll in soliciting companies to join the roll-up through presentations to owners of potential acquisitions.

The promoters, including D&T and Jefferies, actively recruited both alliance companies and numerous other closely-held companies to join EPS as part of the roll-up. The promoter solicited principals of the roll-up companies through written materials and other information. The solicitation materials were prepared by D&T and Massey, and Weinhuff and Jefferies. Most of the solicitation materials were on D&T's stationary. In addition, Massey, Watts and Weinhuff gave oral presentations, supported by written materials and visual aids to induce roll-up companies to join the roll-up. The representations made at these live presentations emphasized both D&T's and Jefferies' role in EPS.

The solicitation materials represented that ICRS had a substantial backlog of revenues ranging from $45 million to $71 million. According to the complaint, these representations were false because they were grossly over-inflated, in large part because they exaggerated the value of contracts and potential contracts that ICRS had with its customers. The solicitation materials also represented that the roll-up companies were each "best-of-breed" and had certain stated growth rates. These representations were allegedly false, and D&T and Jefferies proceeded with the roll-up even though they knew these representations were false.

Once agreeing to participate in the roll-up, each roll-up company signed a letter of intent to sell either its assets or its stock to EPS. In exchange, the roll-up companies' principals would receive stock in EPS and, in some cases, cash and notes.

The sale of ICRS to EPS was negotiated in advance of the roll-up. D&T was represented by Allan Bernikow, Massey's direct supervisor at D&T, and EPS was represented by Massey, who was at this time still a partner at D&T. Bernikow and Massey agreed on a sale price of $11 million, not including the contract between ICRS and NBC under which ICRS operated. EPS entered into a separate contract with D&T to purchase the NBC contract for an additional $20 million, making the total purchase price EPS agreed to pay as $31 million. Nineteen million dollars was paid in cash and $12 million was paid in securities consisting of subordinated promissory notes.

According to the complaint, prior to the sale the promoters, including D&T and Jefferies, knew that an independent evaluation firm, Houlihan, Okey Howard & Zukin Financial Advisors, had prepared an evaluation of ICRS determining the value to be between $4.8 million and $5.8 million including the value of the NBC contract. Nevertheless, the promoters, including D&T

and Jefferies, proceeded with acquisition of ICRS and the NBC contract at $31 million. In addition, Massey, who was a D&T partner at the same time as a promoter and officer of EPS, had a personal interest that was adverse to that of EPS. Massey received a $750,000 bonus from D&T paid from the proceeds of the sale of ICRS.

For each company rolled-up, Massey, Watts and Weinhuff allocated to themselves and ultimately received arbitrage shares in EPS, which represented all or a portion of the purported valued added to EPS by that company beyond that which the principals received for that asset. These shares received by Massey, Watts and Weinhuff were in addition to shares they received as owners of some of the rolled-up companies. In total, Massey and Watts each received approximately 5,032,898 shares and Weinhuff over 2 million shares. At a proposed initial price of $35, that stock would be worth at least $176 million each to Massey and Watts, and $70 million to Weinhuff. In January 1999 Weinhuff resigned from Jefferies and became and employee and officer of EPS.

To fund the roll-up, the Promoters secured senior credit facilities on behalf of EPS from various banks, including Bank of America, in the initial amount of $100 million. The credit was to be repaid through the operations of EPS and, ultimately, out of proceeds from a planned initial public offering promised by the Promoters for early 1999. In addition to its bank debt, EPS paid $19 million in cash to acquire ICRS and the NBC contract from D&T, $1,713,110 in cash in connection with the acquisition of NBC, and over $11 million to Jefferies in fees for its services to EPS.

6

The complaint alleges that as a direct and proximate result of the wrongful conduct of the promoters, including D&T and Jefferies, EPS was saddled with excessive debt and positioned to fail. EPS was declared in covenant default in late 1999, and in payment default in June 2000.

## Discussion

In Counts I and II, EPS alleges that D&T and Jefferies were promoters of owed a fiduciary duty to EPS, which they breached. Both D&T and Jefferies move to dismiss arguing that the complaint fails to set forth sufficient detail as required by Fed. R. Civ. P. 9(b), to support their claim that they were promoters. In addition, Jefferies argues that the engagement letter disclaims any fiduciary duty. The court rejects both arguments.

First, because Counts I and II allege breach of fiduciary duty based on a underlying fraud claim, defendants are correct that the particularity requirement of Rule 9(b) applies, at least with respect to the allegations of the underlying fraud. See Petri v. Garlin, 997 F. Supp. 956, 977 (N.D. Ill. 1977). Whether the allegations of fiduciary relationship fall under the requirement of Rule 9(b) is an issue that the court need not decide, because the allegations in the complaint are sufficiently particular as to both defendants. With respect to D&T, the complaint clearly alleges that D&T provided working capital and employees, the solicitation materials were on D&T stationary, and that D&T directed and controlled the creation, promotion and day-to-day operations of EPS prior to the roll-up. D&T argues that the facts alleged show that Massey was acting at all times in his individual capacity or on behalf of EPS when he formed EPS. The complaint alleges, however, that D&T and Massey were perpetrating a fraud on EPS, and at the time Massey was in fact acting in his own and D&T's interests. These allegations are sufficient to allege that D&T was a promoter of EPS.

7

The complaint is equally specific as to Jefferies' role as a promoter, alleging that Jefferies provided financial advise, performed due diligence, worked with D&T controlling the day-to-day operations of EPS, participated in the preparation of solicitation materials, and took part in the oral presentations promoting EPS in which misrepresentations concerning growth and value were made. The complaint also alleges a number of misrepresentations contained in the promotional materials for which D&T and Jefferies were allegedly responsible, including representations and omissions as to revenue, debt and value.

Because the complaint alleges facts sufficient to establish that defendants were promoters, it also alleges a fiduciary duty owed to EPS. Although the parties disagree as to what law applies to the breach of fiduciary duty claims, they all agree that promoters are fiduciaries to the corporations that they promote. See Gladstone v. Bennett, 153 A. 2d 577, 582 (Del. 1959).

D&T argues, however, that any promotional fiduciary duty was extinguished once EPS was incorporated because the acts of promotion were completed. From that point forward, it is the officers and directors who bear responsibility for acting in the best interests of the corporation. See Parnes v. Bally Entertainment Corp., 722 A. 2d 1243, 1246 (Del. 1999). Although this is true as a basic proposition, a promoter's liability as a fiduciary duty ends only after the promotion plan has been completed; it does not end with mere incorporation if the promotion plan goes beyond that period. See Old Dominion Copper Mining and Smelting Co. v. Bigelow, 89 N.E. 193, 201 (Mass. 1909). In the instant case, the complaint alleges that the fraud scheme began with D&T's exit strategy to sell off ICRS, and continued at least through the solicitation and roll-up. Accordingly, the promoter's fiduciary duties did not automatically end on incorporation.

Finally, both D&T and Jefferies argue that the underlying agreements bar the breach of fiduciary duty claims. D&T argues that the asset purchase agreement between D&T and EPS specifically provides that Massey's actions and knowledge are not to be attributed to D&T, but only to EPS. Similarly, Jefferies argues that the engagement letter explicitly states that Jefferies will use and rely solely on information provided by EPS regarding the roll-up companies, and was required to do no independent investigation. Both these arguments miss the mark. The fraud alleged in this case is that Massey and D&T, and Weinhuff and Jefferies, negotiated these contracts in bad faith, acting in their own interests rather than on behalf of EPS, to whom as promoters they owed a fiduciary duty. If EPS is correct, the contracts would be fraudulent and could provide no protection to defendants. Accordingly, the motions to dismiss Counts I and II are denied.

Count III alleges that D&T and Jefferies aided and abetted Massey's, Watts's and Weinhuff's breach of their fiduciary obligations to EPS. Count VI alleges that D&T and Jefferies conspired with Massey, Watts and Weinhuff to commit fraud. There are no separate torts for aiding and abetting a fraud, or conspiring to defraud. If D&T and Jefferies aided and abetted the fraud, or conspired to commit the fraud, they are liable for participation in the fraud. The claims for aiding and abetting and for conspiracy are therefore needlessly redundant; they add nothing to EPS's claims, Cenco, Inc. v. Seidman & Seidman, 686 F.2d 449, 452 (7th Cir. 1982); Eastern Trading Co v. Refco, Inc., 229 F.3d 617, 623 (7th Cir. 2000). Accordingly, Counts III and VI are dismissed.

In Counts IV, V and VIII, EPS alleges constructive fraud, common law fraud, and securities fraud pursuant to § 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j et. seq.,

against both D&T and Jefferies. Both defendants move to dismiss all three counts, arguing that they are barred by the agreements, fail to plead the fraud with particularity, and are barred because Massey's knowledge should be imputed to EPS. The court has already rejected the first argument. The third argument fails for the same reason. Massey was allegedly engaged in a fraudulent scheme on the corporation he was promoting. His knowledge cannot logically be imputed to that corporation to prevent recovery for the fraud as a matter of law. Finally, the counts contain sufficient particularity. The complaint is very detailed and provides sufficient information as to the time, place and content of the alleged false representations, and the method by which such misrepresentations were committed. Singleton v. Montgomery Ward Credit Corp., 2000 WL 796163 at *2 (N.D. Ill. 2000).

Defendants also argue that Count VIII, alleging securities fraud, fails to plead "facts giving rise to a strong inference of scienter," as is required by the Private Securities Litigation Reform Act, 15 U.S.C. § 78(u-4)(b)(2). The court disagrees. The complaint alleges that both defendants were participants in the fraud from the beginning, and knew that the solicitation materials misrepresented that ICRS has a backlog of revenue between $45 million and $71 million.

Defendants also argue that Count VIII is brought more than one year after the date on which EPS was on inquiry notice of its claim. See Whirlpool Financial Corp. v. GN Holdings, Inc., 67 F.3d 605, 609 (7th Cir. 1995). The court agrees with EPS, however, that whether it had "inquiry notice" is a factual question inappropriate for resolution at this stage of the proceedings. See Kauthar SDN BHD v. Sternberg, 149 F.3d 659, 669 (7th Cir. 1998).

Finally, defendants argue that EPS has no standing under § 10(b) because it has not alleged it purchased or sold securities. Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975). The complaint, however, alleges that the roll-up companies sold stock in their own companies for stock in EPS. An exchange of stock constitutes a purchase or sale. FMC Corp. v. Boesky, 727 F. Supp. 1182, 1194 (N.D. Ill. 1989). Accordingly, the motion to dismiss Counts IV, V and VIII are denied.

In Count VII, EPS alleges professional malpractice against Jefferies. Again, the parties dispute whether New York or California law applies to this claim. It does not matter, however, because the basis of Jefferies' motion to dismiss is a limitation of liability clause in the engagement letter. This court has already rejected any defense based on an engagement letter that was allegedly fraudulently executed. Accordingly, the motion to dismiss Count VII is denied.

In Count IX, EPS alleges controlling personal liability against both D&T and Jefferies pursuant to § 20 of the Securities Exchange Act, 15 U.S.C. § 78t, which provides:

> (a) Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

EPS argues that D&T controlled Massey, and Jefferies controlled Weinhuff, and thus they are liable for Massey's and Weinhuff's conduct. D&T argues that EPS has not alleged that D&T "had the power or ability . . . to control the specific transaction or activity that is alleged to give rise to the liability." Donohoe v. Consolidated Operating & Prod. Corp., 30 F.3d 907, 911-12 (7th

11

Cir. 1994). To support this argument, D&T again relies on the asset purchase agreement, which states that Massey was acting solely on behalf of EPS. Once again, D&T cannot rely on the allegedly fraudulently executed agreement to limit liability for its own alleged fraud.

Finally, there is no private right of action for damages under § 206 of the Investment Advisors Act. TransAmerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 24 (1979). Accordingly, Count X, which seeks damages in excess of $100 million, is dismissed.

## CONCLUSION

For the reasons set forth above, defendants' motions to dismiss are granted as Counts III, VI and X, and denied as to Counts I, II, IV, V, VII, VIII and IX. Defendants are directed to answer the latter counts on or before April 15, 2002. This matter is set for a report on status April 18, 2002, at 9:00 a.m., at which time the parties are to present a definitive discovery plan.

**ENTER:**

*[signature]*

**Robert W. Gettleman**
**United States District Judge**